JOHN A. NELSON and HAZEL J. NELSON, Plaintiffs and
Respondents, v. C & C PLYWOOD CORP., a Montana Cor-
poration, Defendant and Appellant.

No. 11583.
Submitted September 17, 1969.
Decided February 13, 1970.
Rehearing Denied March 10, 1970.
465 P.2d 314.

Korn, Warden & Walterskirchen, Merritt N. Warden argued, Kalispell, for defendant and appellant.

Turnage & McNeil, C. B. McNeil argued, Polson, Murphy, Robinson & Heckathorn, I. James Heckathorn argued, Kalispell, for plaintiffs and respondents.

The HONORABLE PAUL G. HATFIELD, District Judge (sitting in place of MR. JUSTICE HASWELL) delivered the Opinion of the Court.

The defendant, C & C Plywood Corp., a Montana corporation, appeals from a jury verdict of $8,985 and from the denial by the trial court of defendant's several motions, the last of which are to set aside the verdict and judgment and order judgment in accordance with defendant's motion for directed verdict and for new trial.

The plaintiffs, John A. Nelson and Hazel J. Nelson, an

elderly couple, in 1948 purchased a small farm in the Evergreen district near Kalispell, a rural residential area of small tracts of land. During the years they maintained up to 5 cows, a few chickens, and raised vegetables on the farm. Mrs. Nelson churned her own butter. Their water supply was from shallow wells.

In 1948 when they purchased the farm there was one shallow well 125 feet from the barn. This well is still there. Before the plywood operation this well had clear water, except at high-water time in the spring when it became discolored, but apparently did not have the same obnoxious odor and taste as developed later. The Nelsons built a house in 1950 and a sandpoint was driven to a depth of 21 feet near the house. This well was piped to the house and later to the chicken coop and was the well used for the household. In August 1961, a third well was dug by a commercial driller. Well No. 3 was never used except for about 2 weeks and now lies under a driveway. While the record is not clear, apparently No. 3 had the same odor and taste as well No. 2. Well No. 2 was good clear water even at high-water time until the operation of the plywood company. A sample of the water tested in 1957 by the State Board of Health showed no contamination, although the water was high in iron and magnesium. The water was clear and potable for at least 10 years.

In 1960 the defendant plywood company purchased a sawmill adjacent to the Nelson's property and converted it into a plywood manufacturing plant along the northern boundary of the Nelson farm.

The plant commenced operations in the fall of 1960. In the course of production a certain glue is used to bond together sheets of wood veneer. In cleaning the glue equipment each day a certain amount of glue is lost in the washing process. Originally this glue waste was disposed of in the natural drainage ditch which picked up this waste, boiler blow-

down waste and roof drainage; then ran alongside a railroad track adjacent to the plant. The drainage ditch by the track emptied into a slough that crossed plaintiffs' property not far from their buildings.

In November or December 1960, plaintiffs noticed their well water had turned brown and had developed an offensive odor. Mr. Thomason, defendant's manager, was contacted with complaints about the condition of the water, as the contamination of the Nelsons' water supply coincided with the accumulation of glue waste in the drainage ditch and slough. At about the same time as Mr. Nelson began to complain, the plywood company experienced difficulty with its own well water; it also developed a peculiar odor and taste.

The manager denied any responsibility for the Nelsons' water problem and continued to deny responsibility throughout the trial. However, in late 1960 the plywood company dammed the ditch at about the point it left their property and said dam formed a pond on their own land. In two or three months this pond filled up and a large sump hole was dug next to the ditch. This hole filled up in about six months and successive holes or sumps were dug. In all, six or seven sumps were dug. They were about 880 feet from well No. 1.

In 1962 a ditch was dug across Nelsons' land toward the Whitefish river. In 1965 the plywood company installed a compartmentized concrete tank to trap the solid waste. At each change in the methods of depositing the waste, improvements were noticed by the Nelsons in their water supply. This improvement was substantiated by tests made by the State Board of Health, the most important of which is that after the installation of the concrete tank the testing showed a zero phenolic content.

The glue waste contained an extremely high content of "phenols." The well water in the area was, apparently, naturally high in iron and magnesium. The record seems clear that the fact the water was high in iron and magnesium did

not render it distasteful or discolored unless and until sufficient phenols were released in the ground to cause a chemical reaction in which the phenols fed upon the iron-fixing bacteria naturally found in the soil, thereby releasing the iron and magnesium from solution in the water and precipitating it out, resulting in the obnoxious color, taste and odor. There was also discoloration and corrosion of the plumbing fixtures, sinks and utensils. Even the discoloration of the house resulted when the water was used to sprinkle the grass.

The county sanitarian took samples and ultimately the Montana State Board of Health became aware of the problem and conducted several tests of the Nelsons' wells and other wells in the area over a period of time. These tests showed phenolic compounds or "phenols," as they are called, in the following amounts:

| DATE | LOCATION | PHENOLS |
|---|---|---|
| | | Parts per billion |
| Prior to June 1963 | Nelsons' well | 530 |
| August 27, 1963 | Nelsons' well | 1100 old well |
| | | 580 new well |
| August 27, 1963 | Sand Point No. 1 | 0 |
| | Sand Point No. 2 | 760 |
| | Sand Point No. 3 | 760 |
| August 27, 1963 | C & C Plywood Corp. | 3700 & 3080 |
| October 10, 1963 | Nelsons' kitchen tap | 110 |
| | Sand Point No. 3 | 860 |
| | Plywood Corporation glue waste drain ditch | 2940 |
| September 15, 1964 | Nelsons' well | 0 |
| September 15, 1964 | C & C well | 0 |
| September 30, 1964 | Nelsons' well | 38 |
| April 19, 1965 | Nelsons' well (old) | 3 |
| | Nelsons' well (new) | 16 |
| | C & C's settling tank out flow | 11,500 |

.

| June 1, 1965 | Nelsons' well | 0 |
| July 28, 1965 | Nelsons' well | 15 |
| September 1965 | Nelsons' well (old) | 3 |
| | Nelsons' well (new) | 34 |
| November 23, 1965 | Nelsons' well | 53 |
| January 5, 1966 | Nelsons' well | 59 |
| August 30, 1966 | Nelsons' well | 0 |
| February 1967 | Nelsons' well | 4 |
| March 21, 1968 | Nelsons' well | 0 |

There is a real factual dispute in this case based primarily upon the expert testimony given. The plaintiffs' expert was the State Board of Health employee, John Spindler. The defendant, appellant here is adamant that its objection to the opinion of Mr. Spindler should have been sustained on the question of the direction of flow of the ground water. Mr. Spindler is a public health biologist with master degrees in aquatic biology and in public health, primarily in the field of water pollution. He is employed by the Montana State Department of Health in the area of water pollution. It was his expert opinion that the surest way to determine the underground flow of water was by placing a known substance into the underground water supply and tracing its path. It was his opinion that the phenols in this case were exotic material not found naturally in abundance and massive enough in quantity so that it could be traced. Further, that they were deposited into the soil in massive quantities at a known point and that approximately midway between the known point and the Nelsons' well, sandpoints had been driven and phenols in high quantities were found, but in an amount less than at the original point and that phenols were still found in the Nelsons' well in critically high but lesser amounts.

The defendant's expert, Mr. Ron Anderson, a chemist with Reichhold Chemicals of Tacoma, Washington, testified that the phenols found in the Nelson well were not the same phenols deposited by the plywood company. Apparently one

of the arguments of the defendant is that this testimony was conclusive. However, the cross-examination brought up the point that assuming the phenols were placed in the ground by the plywood company that in the travels of the phenols through the ground there could have been chemical reaction with other minerals and chemicals in the ground so that the phenols in the well may have a different chemical composition than when deposited by the plywood company; therefore, would show differently on the spectogram taken.

Also, the defendant had an engineer testify as to the direction of flow of the ground water and his conclusion was that the direction was away from the Nelson well. Again, cross-examination brought out that the tests he had made were made at high-water time.

The recent Montana case of Graham v. Rolandson, 150 Mont. 270, 285, 435 P.2d 263, sets out the rule as to what is necessary to qualify a witness as an expert, a person skilled on a question of science.

"The opinion of a witness on a material question of science, art, or trade in which he is skilled is admissible in evidence. (Section 93-401-27, R.C.M. 1947.) The determination of the qualification of a skilled or expert witness is a matter largely within the discretion of the trial judge, and in the absence of a showing of abuse, ordinarily will not be disturbed (Nesbitt v. City of Butte, 118 Mont. 84, 163 P.2d 251; Krohmer v. Dahl, 145 Mont. 491, 402 P.2d 979)."

The appellant's contention is that because Spindler's testimony or opinion as to the direction of flow of the ground water was inadmissible that therefore there is insufficient evidence to sustain the verdict. Further, it contends that even with Spindler's evidence the plaintiffs failed on their burden of proof to show substantial evidence to support the verdict. A statement of the long standing rule in Montana is found in Bernhard v. Lincoln County, 150 Mont. 557, 560, 437 P.2d 377, 380:

"\* \* \* When such a question is before this court we will only review the evidence to decide if the verdict is supported by substantial evidence. Breen v. Industrial Accident Board (1968), [150 Mont. 463], 436 P.2d 701. The fact that there were conflicts in the testimony does not mean there is not substantial evidence to support the verdict. We must accept the evidence believed by the jury 'unless that evidence is so inherently impossible or improbable as not to be entitled to belief \* \* \*.' Wallace v. Wallace, 85 Mont. 492, 279 P. 374, 377, 66 A.L.R. 587 (1929)."

In the instant case the jury was instructed on expert testimony as follows:

"*Court's Instruction No. 6:* The rules of evidence ordinarily do not permit the opinion of a witness to be received as evidence. An exception to this rule exists in the case of expert witnesses. A person who by education, study and experience has become an expert in any art, science or profession and who is called as a witness, may give his opinion as to any matter in which he is versed and which is material to the case. You should consider such expert opinion and should weigh the reasons, if any, given for it. You are not bound, however, by such an opinion. Give it the weight to which you deem it entitled, whether that be great or slight, and you may reject it, if in your judgment the reasons given for it are unsound."

In State v. London, 131 Mont. 410, 436, 310 P.2d 571, 585, the instruction given was as follows:

" 'Duly qualified experts may give their opinions on questions in controversy at this trial. To assist you in deciding such questions, you may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. You are not bound to accept the opinion of an expert as conclusive, but you should give to it the weight to which you shall find it to be entitled. You may disregard any such opinion, if you find it to be unreasonable.' "

Commenting on this instruction, this Court said:

"Appellant contends that this instruction informs the jury that they may disregard and discredit the testimony of experts. While it is true that 'The law makes no distinction in weighing evidence between expert testimony and evidence of other character. It is for the trier of the facts to determine the weight to be given to any evidence.' Weakley v. Cook, 126 Mont. 332, 249 P.2d 926, 928. To our mind the instruction does no more than tell the jury that expert opinions are to be received and weighed on the same basis as other testimony. This particular instruction is patterned after section 1127b of the California Penal Code, adopted by that state in 1929, and since then used in all cases requiring an instruction upon expert witnesses. * * * "Since opinions of experts are admitted under a special provision of our code, R.C.M.1947, § 93-401-27, subd. 9, we believe that the court in a proper case should instruct the jury as to such testimony in order that they may have a guide to the manner in which they should consider and weigh the opinions of such experts. This appearing to be such a case, we deem the instruction proper."

Therefore, it is our opinion that to allow the opinion of the expert Spindler was within the discretion of the trial judge, and we do not find an abuse of discretion in this regard. Secondly, the jury was properly instructed as to how to weigh this evidence and apparently believed the plaintiffs' expert.

The court in this case instructed the jury both on nuisance and negligence. The defendant appellant relies on this as one of its specifications of error. In order to untangle this, it will be necessary to go back through the Montana law on private nuisance. We will deem the question here—Liability for pollution of subterranean waters (See annotation, 38 A.L.R.2d 1265).

For background, the Restatement of Torts in the introduction to Chapter 40, Invasions of Interests in the Private Use of Land (Private Nuisance), states at p. 218 as follows:

"The action for private nuisance originated in the assize

of nuisance which dates back to as early as the twelfth century. This action was complementary to the assize of novel disseisin. While the assize of novel disseisin was an action for redressing interferences with the seisin of land, the assize of nuisance provided redress where the injury was not a disseisin, as where there was no entry on the plaintiff's land but was an indirect damage to the land or an interference with its use and enjoyment. The assize of novel disseisin was directed to secure an undisturbed possession; the assize of nuisance to secure its free enjoyment. * * * Early in the fifteenth century, the assize of nuisance was replaced by an action on the case for nuisance which became the sole common law remedy. * * *"

The above is recognized in Montana, see Chessman v. Hale (1905), 31 Mont. 577, 587, 79 P. 254, 68 L.R.A. 410.

The Restatement continues at p. 220:

"Private nuisance is a field of tort liability. It is not a single type of tortious conduct. The feature that gives unity to this field is the interest invaded, namely, the interest in the use and enjoyment of land. That interest may be invaded by any one of several types of conduct. An invasion may be intentional or unintentional. And unintentional invasion may be caused by negligent, reckless or ultrahazardous conduct, or it may be wholly accidental. * * * Invasions which are intentional, or which are the results of negligent, reckless or ultrahazardous conduct, subject the actor to liability in this field as they do in other fields. Thus the tort of private nuisance includes intentional harms, and harms caused by negligent, reckless or ultrahazardous conduct.

"*Failure to recognize that private nuisance has reference to the interest invaded and not to the type of conduct which subjects the actor to liability has been a fertile cause of confusion. Thus, in respect to an interference with the use and enjoyment of land, attempts are made to distinguish between private nuisance and negligence, overlooking the fact that pri-*

vate nuisance has reference to the interest invaded and negligence to the conduct that subjects the actor to liability for the invasion. Similar distinctions are attempted between private nuisance and ultrahazardous activities for the same reason." (emphasis added)

See discussion in Dutton, Mollenberg v. Rocky Mtn. Phosphates, 151 Mont. 54, 438 P.2d 674.

The Restatement goes on to say at p. 221: "This confusion is mainly due to a failure to notice in respect to private nuisance the change that has occurred in the basis of tort liability. In early tort law the rule of strict liability prevailed. An actor was liable for the harm caused by his acts whether that harm was done intentionally, negligently or accidentally. In course of time the law came to take into consideration not only the harm inflicted, but also the type of conduct that caused it, in determining liability. This change came later in the law of private nuisance than in other fields. Private nuisance was remediable by an action on the case irrespective of the type of conduct involved. Thus the form of action did not call attention to the change from strict liability to liability based on conduct. * * *"

In the field of private nuisance in Montana the early case law appears to go both ways. In Fitzpatrick v. Montgomery (1897), 20 Mont. 181, 184, 50 P. 416, the Montana court applied the rule of strict liability. This case involved tailings from a placer mine, as follows:

" 'The only questions presented by this appeal are, first, whether the court is correct in its conception of the law that in placer mining the operator becomes responsible at all events where any damage results from his mining operations, and that the question of care in conducting his business becomes absolutely immaterial; * * *' "

In this case the judgment for the plaintiff was affirmed on this basis.

But in Hopkins v. Butte & M. Commercial Co. (1893), 13

Mont. 223, 33 P. 817, a case involving floating logs on the Smith River which became jammed and dammed water behind themselves flooding the plaintiff's ranch, and in King v. Miles City Irrigating Ditch Co., 16 Mont. 463, 41 P. 431, a case of flooding of plaintiff's land by breaking of the defendant's irrigation ditch, the trial courts had proceeded on the theory of strict liability, but both were reversed and instructions on negligence were ordered for the retrials.

In Fleming v. Lockwood (1907), 36 Mont. 384, 92 P. 962, 14 L.R.A., N.S., 628, Mr. Justice Holloway reviews the prior Montana case law in a case involving a seeping irrigation ditch and concludes that the Fitzpatrick case, supra, must have been tried as a trespass action because:

"* * * This, at least, is the theory of most of the cases cited in the opinion in the Fitzpatrick Case; and while it is a matter of doubt whether the Fitzpatrick Case was in fact of such character, it was evidently treated as such, for upon no other possible theory can it be sustained." 36 Mont. at p. 390, 92 P. at p. 964.

"* * * Upon the facts stated, it (the seeping ditch) could only be maintained as an action of trespass on the case, since there is not any contention that Lockwood intentionally caused the water to seep from his ditch * * and therefore the plaintiff had the burden of proof, in the first instance, to show negligence on the part of the defendant. * * *"

So, therefore private nuisance in Montana was taken out of the realm of strict liability and required proof of negligence for a recovery.

This has remained the law in Montana until the case of Dutton v. Rocky Mountain Phosphates, supra, but the Dutton case is limited to its facts and allows recovery under a strict liability theory in that situation.

It is therefore apparent, we believe, from the authority cited, that the trial judge was right in instructing both on

the definition of private nuisance and also the elements to constitute negligent conduct.

It will also be necessary to go into the question of ground percolating waters in Montana. The defendant appellant relies upon Ryan v. Quinlan, et al. (1912), 45 Mont. 521, 124 P. 512, where Chief Justice Brantly reviews the law from other jurisdictions to apply it to the appropriation of percolating ground waters in Montana, concluding at page 533 of 45 Mont., at page 516, of 124 P.

"The result of it is that the proprietor of the soil, where such water is found, has the right to control and use it as he pleases for the purpose of improving his own land, though his use or control may incidentally injure an adjoining proprietor. The general rule thus stated is subject, however, to the same limitation as the use of the land itself, *viz.*, that embodied in the maxim, *'Sic utere tuo ut alienum non laedas,'* or, as is said in some of the cases, the use must be without malice or negligence. * * *"

Also, defendant relies on McGowan v. United States, U. S. District Court for Montana (1962), 206 F.Supp. 439, a case where Judge Murray held that a drainage project on adjacent land to the plaintiff's that apparently had the result of drying up plaintiff's natural spring whose source was percolating waters on the defendant's controlled land was again *damnum absque injuria,* relying on Ryan v. Quinlan, supra.

Chief Justice Brantly, in Ryan v. Quinlan, supra, reviews the law and relies heavily on language from Wheatly v. Baugh, 25 Pa. 528, 64 Am.Dec. 721, where Mr. Chief Justice Lewis of Pennsylvania has set out the rule that Judge Brantly has adopted for Montana.

In Perkins v. Kramer (1966), 148 Mont. 355, 362, 423 P.2d 587, Mr. Justice Castles cites Ryan v. Quinlan, supra, in a case relating to appropriation of percolating waters as follows:

"The fact that groundwater is not easily traced in its movement is the reason why this court has said: 'The secret,

changeable, and uncontrollable character of underground water in its operations is so diverse and uncertain that we cannot well subject it to the regulations of law, nor build upon it a system of rules, as is done in the case of surface streams.' * * *

"Modern hydrological innovations have permitted more accurate tracing of groundwater movement. For this reason, we feel that traditional legal distinctions between surface and groundwater should not be rigidly maintained when the reason for the distinction no longer exists. The use of chemical dyes, chloride solutions, and radioisotopes to trace groundwater migration is well-established. More recent techniques include the use of electric analogs and computer analysis. These tracing methods require the drilling of test wells as well as geological analysis of the water-bearing structure. * * *"

Bringing this together, then, reference will be made to a line of Pennsylvania cases, the two most relevant and pertinent being Burr v. Adam Eidemiller, Inc., 386 Pa. 416, 126 A.2d 403, which was the pollution of a natural spring, and Reinhart v. Lancaster Area Refuse Authority, 201 Pa. Super. 614, 193 A.2d 670, the pollution of a well. In the first case a highway contractor leached cinders into plaintiff's water supply, a natural spring. At p. 406, 126 A.2d, the Pennsylvania Superior Court states: "* * * we adopted the rule of the Restatement of Torts with respect to an action for damages for a non-trespassory invasion of another's interest in the private use and enjoyment of land. At page 448 of 379 Pa., at page 314 of 109 A.2d we said: 'The Rule of the Restatement, which unquestionably is accurate and most comprehensive, is as follows: "Section 822. General Rule. The actor is liable in an action for damages for a non-trespassory invasion of another's interest in the private use and enjoyment of land if, (a) the other has property rights and privileges in respect to the use or enjoyment interfered with; and (b) the invasion

is substantial; and (c) the actor's conduct is a legal cause of the invasion; and (d) the invasion is either (i) intentional and unreasonable; or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultra-hazardous conduct." This rule we adopt. We agree that the adoption will obviate the difficulty and confusion in attempting to reconcile or distinguish the great mass of cases. We are not violating precedent and are not conflicting; in major degree, with the principles of *stare decisis*.'

"The plaintiffs based their claim on Clause (d), Sub-clause (i) of § 822 of the Restatement above quoted, and it was not necessary for them to prove, as urged by the appellant, that its conduct was negligent, reckless or hazardous. Such proof is required only where the invasion is unintentional. The court properly instructed the jury that liability could be imposed upon the defendant if they found by the fair weight and preponderance of the evidence that there was an invasion by the defendant of the plaintiffs' rights and also found that the invasion was intentional and unreasonable.

"Appellant's contentions are (a) that the evidence did not justify a finding of intentional misconduct on its part; (b) that even if its conduct were deemed intentional, it was not unreasonable under the circumstances, and (c) that defendant's operation was not the only damaging factor, that the water could have been polluted or contaminated by other causes and that the verdict was therefore purely conjectural. Considering the last contention first, defendant argues that the contamination could have resulted from old abandoned oil wells in the community, or by seepage and sewage of the cesspools of neighbors or by a change of subterranean stratum caused by blasting of the M. & S. Construction Company. The dye test which traced the water from the defendant's leaching process to the plaintiffs' spring established that water from defendant's operation unquestionably entered the spring. There was no evidence—and no tests were made—that water escaped

from the old oil wells or cesspools and entered the spring. Against this conjectural possibility was the fact that no pollution of the spring occurred until defendant's operation. As to the suggestion that a change of subterranean stratum was caused by the blasting of the M. & S. Construction Company, this blasting had been carried on six months before the operation of the defendant company and the spring had remained pure. It had supplied all the drinking water for the employees of the construction company, local highway officials and employees of the defendant company up until the leaching process was commenced.

"Turning to defendant's other contentions upon which reliance is principally placed, we think the evidence fully justified a finding that defendant's conduct was intentional. Section 825 of the Restatement divides intentional invasion into two classes: (a) where the actor acts for the purpose of causing it; or (b) where the actor knows that it is resulting or is substantially certain to result from his conduct. In Illustration 4 of the Comment following § 825 of the Restatement it is stated: 'Same facts as in Illustration 3 except that after learning of the pollution of B's well, A continues to dump waste into the same depression which causes further pollution of the well and more interference with B's poultry business. These further invasions of B's interest in the use and enjoyment of his land are intentional.' The defendant company knew in three days after starting its operations that the plaintiffs' spring was polluted and then or shortly thereafter knew that the pollution was coming from the slag pile. Nevertheless the defendant company continued its operations unabated. The jury was instructed that no intentional invasion of any rights of the plaintiffs could arise until the defendant knew of the contamination of the spring, and proceeded to conduct the leaching process with no attempt to correct it.

"As to appellant's contention that even if its conduct be deemed intentional, the use was not unreasonable, we think

the court properly left the reasonableness of the use to the jury. There was testimony adduced by appellant that it would cost the estimated sum of $25,000 to move its 'batch plant', as its operation was termed, to another location on its leased land, and that such removal would take three weeks, seriously interfering with the performance of the company's paving contract. On the other hand Eidemiller, defendant's vice-president, who was familiar with the operation of the batch plant and the surrounding territory, and was frequently at the job, admitted that the run-off water from the slag could have been prevented from percolating or filtrating into the soil and thence to the plaintiffs' land by placing corrugated iron sheets underneath its bins and carrying the run-off downhill beyond the point where it could reach the plaintiffs' spring. In its comprehensive treatment of non-trespassory invasion of another's interest in the private use and enjoyment of land, the Restatement considers the utility of a defendant's conduct as opposed to the gravity of the harm, and in Clause (c) (g) of the Comment on § 828 states: 'When a person knows that his conduct will interfere with another's use or enjoyment of land, and it would be practicable for him to prevent or avoid part or all of the interference and still achieve his purpose, his conduct lacks utility if he fails to take necessary measures to avoid it  *  *  *.' Pfeiffer v. Brown, 165 Pa. 267, 30 A. 844, cited by appellant, is in accord with the principles laid down by the Restatement. There it was held that where a landowner, by drilling an oil well and pumping, increases the aggregate quantity of water discharged, concentrates it at an artificial point of flow, and changes its character from fresh to salt, thereby injuring the lands of an adjoining owner, he is liable for the injury, if he could have avoided inflicting it by reasonable care and expenditure.

"There is another factor bearing upon the reasonableness of the defendant's conduct in the instant case. The area here involved was residential rural and the particular activity of

the defendant was neither suited to the character of the locality nor was it a natural use of the land as in the development of property for taking out oil, coal or some other mineral. Referring again to the Restatement, the Comment on § 828(b) states: '* * * Where the particular activity or inactivity is not suited to the character of the locality, the conduct generally lacks utility and the invasion it causes is generally unreasonable as a matter of law if the harm involved is at all serious * * *. An intentional interference with a use or enjoyment of land which is well suited to the character of the locality cannot ordinarily be justified as reasonable when the conduct which causes it is unsuited to that locality.' "

In the Reinhart case, supra, in reference to the pollution of the well, the Superior Court of Pennsylvania, in addition to what has been cited from the Burr case, supra, states as follows:

"Restatement, Torts § 832, applies the rule to waters: 'Nontrespassory invasions of a person's interest in the use and enjoyment of land resulting from another's pollution of surface waters, subterranean waters or water in watercourses and lakes are governed by the rule stated in §§ 822-831 of this Chapter." 193 A.2d 672.

Judge Montgomery of Pennsylvania then begins a general review of Pennsylvania law pertinent to the interference or pollution of ground percolating waters in that state. At p. 673 of 193 A.2d, he states:

"In the leading case of Wheatley v. Baugh, 25 Pa. 528 (1 Casey 528), Chief Justice Lewis, in his learned opinion, gives much enlightenment on this subject. In distinguishing between surface streams, subterranean streams, established or unknown, and percolating waters, he says at page 532 of 25 Pa., 'But percolations spread in every direction through the earth, and it is impossible to avoid disturbing them without relinquishing the necessary enjoyment of the land. Accordingly the law has

never gone so far as to recognize in one man a right to convert another's farm to his own use, for the purposes of a filter.' And further, he says, 'No man could dig a cellar, or a well, or build a house on his own land, because these operations necessarily interrupt the filtrations through the earth.' In that case the spring which had been destroyed was considered as depending on percolations alone, but if the spring had been the result of a distinct watercourse leading to it he has this to say at page 535 of 25 Pa., 'If this should be shown, and it should also appear that it could have been preserved without material detriment to the owner of the land through which it flowed, the destruction of it might be attributed to malice or negligence. In that case the law would furnish redress, because the injury would be unjustifiable.' "

He concludes as follows:

"This is a subject which involves many niceties and difficulties, and for that reason we have reviewed it to a great extent but certainly not exhaustively. Much might be written to justify our decision on the basis of nuisance or the ultrahazardous nature of this project. However, we prefer to resolve it on the basis of negligence, the theory upon which the Collins case [Collins v. Chartiers Val. Gas. Co., 131 Pa. 143, 18 A. 1012, 6 L.R.A. 280] was also based and on which the present case was tried."

Therefore, relying on the same law that the defendant appellant here is relying on, or at least on the same source of law, the Pennsylvania Superior Court, following *stare decisis,* has retained the prior law including Wheatley v. Baugh, supra, relied upon by Judge Brantly and states further under almost identical factual situations that the trial jury was justified in a verdict for the plaintiff in a case similar to the one before the Court.

One additional specification of error is misconduct on the part of a juror in that the juror, contrary to and in disregard of admonitions by the court, viewed and inspected the property

of the plaintiffs and its relationship to the property of the defendant on the evening prior to the deliberation by the jury and reported the results of her viewing and inspection to other members of the jury during their deliberation.

The trial judge found that the juror was guilty of misconduct in conducting a private investigation or viewing of the property of the plaintiffs and its relationship to the property of the defendant. However, the court found that the matters reported by the errant juror were matters which were supported by substantial evidence presented during the course of the trial. He further found that the misconduct was not prejudicial to the defendant. We concur in this result. See the Annotation, 11 A.L.R.3rd, p. 918, Prejudicial Effect of Unauthorized View by Jury in Civil Case of Scene of Accident or Premises in Question.

We specifically find in the instant case that the trial judge is right in that there was substantial evidence in the trial on each of the points raised by the defendant in its affidavits of misconduct.

The most serious question is the statute of limitations. In Watson v. Colusa-Parrot M. & S. Co. (1905), 31 Mont. 513, 79 P. 14, the Montana court investigated this problem and came to the conclusion that for permanent injury the statute runs from the time the injury becomes complete to the land's use and enjoyment. The case also holds that as to injury to growing crops the statute would be different than to the permanent injury to the land. The recovery of injury to growing crops is available to the plaintiff until the injury becomes permanent to the land. While the decision is not clear as to what statute would apply to a continuing nuisance, the Court said:

"It may be well to announce, for the guidance of the lower court upon another trial, that, if any part of the statute of limitations is at all applicable under this opinion, it would be Section 518 of the Code of Civil Procedure [now 93-2613]—

which is not pleaded, as this is not an action arising under either of the sections pleaded in the answer."

The sections plead were present sections 93-2504, 93-2505, 93-2604 and 93-2607(2) R.C.M.1947. The defendant appellant in this case is relying on section 93-2607(2). It is well to note that the Legislature by section 1, chapter 172, Laws of 1921, did amend section 93-2607(2) so that it would have applied in the Colusa case, supra, had it existed then as it does now. That is to say, this section would include a private nuisance action within the two-year limitation.

So, the next determination is whether in this case we have a permanent, temporary or continuing nuisance. The defendant appellant maintains that it is a permanent nuisance and, therefore, because it commenced on or about the fall of 1960 and the complaint was not filed until 1965 that section 93-2607(2) is a complete bar to the action. As a general statement, see 39 Am. Jur., Nuisance, Section 141, p. 402, where it is said:

"* * * when the injury is not complete so that the damages can be measured at the time of the creation of the nuisance in one action, but depends upon its continuance and the uncertain operation of the seasons or of the forces set in motion by it, the statute will not begin to run until actual damage has resulted therefrom. Thus, where the nuisance is temporary and continuous in character, and gives rise to separate causes of action, a recovery may be had for damages accruing within the statutory period next preceding the commencement of the action, although more than the statutory period has elapsed since the creation of the nuisance." (See 75 A.L.R. 529).

In this case we hold that the pollution of the ground water by dumping of the glue waste is such a continuing temporary nuisance. As Mr. Justice Brandeis states in Harrisonville v. W. S. Dickey Clay Mfg. Co. (1932), 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208:

"* * * This nuisance has at all times been removable

by the device of secondary treatment of the sewage. It may be hereafter abated at any time by the state health authorities requiring such treatment. The city may itself conclude that this should be done in the public interest, financial or otherwise. Being so terminable, pollution of the creek cannot be deemed to be a permanent nuisance as of the date of the installation of the disposal plant in 1923."

In the instant case the trial judge instructed the jury as follows:

*"Instruction No. 13:* If you find, for the plaintiffs, you may find damages, if any, as follows:

"1. A reasonable sum not exceeding the cost to the plaintiffs of restoring or replacing the fixtures, appliances, water supply and dwelling, but not exceeding the sum of $1,585.00.

"2. The discomfort, annoyance and inconvenience, if any, suffered by the plaintiffs for whatever period, if any, you might find commencing January 1, 1962 and ending March 1, 1968 and in whatever reasonable amount, if any, not exceeding the sum of $100.00 per month for such period or portion thereof."

Again, the defendant strenuously objects that this was an improper measure of damage. The plaintiffs made no objection to this instruction and are therefore bound by it.

The jury awarded $8,985 and by the simple device of subtraction it may be said that this amount is exactly the maximum the jury might award under the court's instruction. That is to say, it is exactly $1,585 for the specials plus $100 a month for each month with a beginning date of January 1, 1962. The limitation to $100 per month was the prayer of the complaint and no objection to the instruction was made by either party at the settlement of the instructions.

The trial judge rejected an instruction which would have limited recovery before August 17, 1963, which would have been 2 years before the filing date of the complaint, filed August 17, 1965. The trial judge's instruction was erron-

eous in not limiting the recovery to 2 years before August 17, 1965, as discussed previously.

█ As set out before, it is the opinion of this Court that the case was properly tried and this appellate court has power to limit portions of the verdict or judgment covering periods barred by statute of limitations, under the authorities cited in the Annotation at 26 A.L.R.2d 596, from which we quote as follows:·

"[If] the excess may be so segregated that the court can distinguish and separate the erroneous part, or the excess is capable of correction by computation, the common practice is either to permit the party recovering the excessive judgment to file a remittitur in the appellate court and affirm the judgment as so modified, or, which amounts to the same thing, to give him leave to file the remittitur in the trial court and direct the entry of judgment for the modified amount, instead of reversing the judgment and ordering a new trial. 3 Am.Jur., Appeal and Error § 1174."

See also Klemens & Son v. Reber Plbg. & Htg. Co., 139 Mont. 115, 360 P.2d 1005.

It is therefore ordered that this cause be remanded to the district court with instructions to modify its judgment by remitting therefrom the sum of $1,950 and as so modified the judgment will be affirmed; each party to pay their own costs.

MR. CHIEF JUSTICES JAMES T. HARRISON, MR. JUSTICES CASTLES and JOHN C. HARRISON, and the HONORABLE THOMAS DIGNAN, District Judge, sitting for MR. JUSTICE BONNER, concur.