No. 12237

IN THE SUPREME COURT OF THE STATE OF MONTANA

1972

---

GEORGE WADDELL,

Plaintiff and Respondent,

-vs-

AMERICAN BREEDERS SERVICE INC.,
a corporation,

Defendant and Appellant.

---

Appeal from: District Court of the Sixteenth Judicial District,
Honorable A. B. Martin, Judge presiding.

Counsel of Record:

For Appellant:

Lucas, Jardine & Monaghan, Miles City, Montana.
Thomas M. Monaghan argued, Miles City, Montana.

For Respondent:

Gene Huntley argued, Baker, Montana.

---

Submitted: October 20, 1972

Decided: JAN 17 1973

Filed: JAN 17 1973

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from a jury verdict in favor of plaintiff in an action to recover damages brought in the district court of the sixteenth judicial district, county of Custer. Defendant moved for a judgment notwithstanding the verdict and for a new trial. Both motions were denied.

Hereinafter, plaintiff George Waddell will be referred to as Waddell, and defendant American Breeders Service, Inc. will be referred to as ABS.

Waddell is a cattle rancher operating in the Pine Hills, east of Miles City. In 1966, he had built up a herd of some 200 to 250 head of cows and some 100 to 150 yearlings in a calf-cow operation. He became interested in the ABS artificial insemination program through discussions with Bill Stewart, the ABS representative in that area. He was told by Mr. Stewart that if he used the ABS service he would have available better bulls, that he would get bigger and more uniform calves; that such service would be as successful as natural service; that such service would be just as cheap; and that he could get 70% service during the first heat period and should get 70% calves.

During the 1966-67 winter, Waddell enrolled in a school held by ABS at Miles City, where he learned how to successfully artificially inseminate his herd. The cost of the course was $100. At the school he was given a manual entitled "American Breeders Service AI Manual--Management Manual". This book was introduced as an exhibit and considerable testimony was introduced by reading from the manual headings such statements as: "The maximum use of outstanding bulls"; "Greatly increased uniformity"; "Improved cow herd"; "Carcass quality improvement"; and "Under good management most operators report 80 to 90 percent". From the manual the following was read into the record:

"The range in heat detection levels reported around the country shows a relatively wide variation. Under good management most operators report 80 to 90 percent detection rates for first service. Assuming a 70 percent conception this percentage of cows settled after one cycle compares very favorably with natural service averages under similar conditions.

"* * * it would be just as cheap or cheaper than using natural service."

As part of the schooling Waddell was urged to purchase frozen semen from ABS for these reasons:

1. Maximum use of outstanding bulls.

2. Increase the uniformity in his calf crop.

3. An improved cow herd.

4. Carcass quality improvement.

5. Improved herd records.

6. Better health protection for his livestock.

7. Better protection against inherent defects with respect to his livestock.

8. Facilitation of crossbreeding.

9. A cheaper method of breeding than natural service.

As a result of the school and Waddell's interest in the program, in the spring of 1967 he purchased 40 ampules of Black Angus semen from ABS bull Skylandmere, to use for the 1967 breeding season. Waddell's cattle were Hereford and the reason he gave for purchasing Black Angus semen was to crossbreed and thereby get a black calf with either a white or brockel face. He maintained that by using this system he could tell those calves that came from the artificial insemination from those sired by his own Hereford bulls. For the 1967 breeding season Waddell picked at random from his herd about 50 cows to be inseminated. Waddell performed the insemination work, put the cows into a separate pasture and put a clean-up bull in with them. As a result of this first year program, his 1968 calf crop was a little above 70% and he was well satisfied with the program.

For the 1968 breeding season, Waddell placed another order for forty ampules of frozen semen from the same bull, Skylandmere.

That year instead of a random selection, Waddell picked his best cows and the earliest calfing cows. 55 of these cows were picked and inseminated. All were Herefords.

In 1968, the insemination work was done by Kelly Waddell, plaintiff's son, hereinafter called Kelly. Kelly also had some cattle and during the year 1967-68 he had become interested in the artificial insemination program. He attended the same school his father had attended during the 1967-68 session. When Waddell ordered his 40 ampules from Skylandmere, Kelly put in an order for 16 ampules of semen from the bull Leader, a Shorthorn bull.

Kelly and his father conducted their artificial insemination program together with Kelly doing the work and Waddell riding herd and observing. The semen they purchased from ABS came in a jug or refrigerator, where it was kept frozen by nitrogen. Kelly testified, as did Waddell from his observation, that the cows were uniformly inseminated; that no special problems arose in the process; and that the weather factor was good. Bill Stewart, the ABS representative, was present during part of the work to see if Kelly was doing it correctly and Stewart helped with 6 to 8 cows.

Upon completion of the insemination, the cows were turned into a separate pasture where Waddell had a clean-up bull to cover those cows where artificial insemination did not take. Several weeks later Waddell noted that the clean-up bull was over used, so he put in another bull.

When the spring of 1969 came, Waddell was faced with a crop failure. Of the 40 ampules of semen used, he got only 3 black calves; as against the 1968 crop of 70% he had but 7% in 1969. Yet, Kelly's cows, impregnated at the same time as Waddells, resulted in: 12 heifers were impregnated; 1 died, 3 were sold as bred heifers, and of the remaining 8 heifers 6 were crossbred. A 75% result. So, the two herds handled under exactly the same conditions by the same inseminator resulted in Waddell getting a 7% calf crop, and Kelly a 75%. The one difference being that Kelly had semen from a different bull.

- 4 -

Waddell notified Bill Stewart in the spring of 1969 of his calf crop failure and Stewart immediately contacted ABS offices to check what might have happened. At the request of ABS stewart had Waddell collect all the used ampules. Each ampule had a code mark that identified it as belonging to a certain bull, which aided ABS to trace the semen to the exact date of collection, processing and shipping. Shipments of semen from the same bull, with the same code, were traced to other cattlemen and some of it was recovered for testing. Tests were made by the ABS laboratory and by Dr. Peter Burfening, an assistant professor of physiology in the animal science department of Montana State University. His test figures corresponded favorably with the tests conducted by the ABS laboratory in that they found the frozen semen from 35% to 40% motile. The ABS tests showed a 29% motility factor. Both Dr. Burfening and Dr. Bartless, vice-president of ABS, testified that these percentages were within acceptable standards.

Defendant sets forth four issues for consideration:

1. Whether the district court erred in refusing to direct a verdict in favor of defendant and against plaintiff at the close of plaintiff's testimony?

2. Whether the district court erred in refusing to allow defendant to present the testimony of Jack M. Brooks and Louie Petrie?

3. Whether there were errors in law occurring at the trial and excepted to by defendant, which prevented defendant from having a fair and impartial trial?

4. Whether the district court erred in giving and refusing certain instructions to the jury?

The first issue alleges error in the trial court's refusal to direct a verdict in defendant's favor at the close of plaintiff's case on either of plaintiff's theories of express or implied warranty.

This Court in Mueller v. Svejkovsky, 153 Mont. 416, 420, 455 P.2d 265, held:

"On an appeal from a motion denying a directed verdict there are three rules which apply. (1) The evidence introduced by the plaintiff will be considered in the light most favorable to him. (2) The conclusion sought to be drawn from the facts must follow as a matter of law. (3) Only the evidence of the plaintiff will be considered."

Where there is substantial evidence to support the trial court's findings at the conclusion of plaintiff's case, and there is no clear preponderance against it, the court's ruling will not be disturbed on appeal. Spencer v. Robertson, 151 Mont. 507, 445 P.2d 48.

Defendant argues that even if we find the trial court was not in error, that the issue must be resolved in its favor due to the fact there was a failure to timely notify the defendant. As we view defendant's argument, plaintiff should have notified defendant when he found he had an overworked bull, not some ten months later when he found he had a 7% calf crop and not the 70% of the year before. We find no merit to this argument.

Nor can we accept defendant's argument that as a matter of law plaintiff did not give notice of a breach of warranty until after he should have discovered it. Defendant submitted an instruction that allowed the jury to consider whether the notice was adequate. Court's instruction No. 12 reads:

" A seller is not liable for a breach of warranty unless the buyer gave him notice of such breach within a reasonable time after the buyer knew, or as a reasonable person ought to have known of the alleged breach of warranty. What amounts to a reasonable time depends upon the circumstances and the kind of product involved.

"Notice may be oral or in writing; no particular form of notice is required. It merely must inform the Seller of the alleged breach of warranty and the buyer's intention to look to him for damages. Whether the buyer gave this information to the Seller and if so whether he acted within a reasonable time in this case, is for you to determine."

In effect, defendant wants it two ways. At trial ABS asked for and got an instruction asking the jury to rule on the notice in its favor, and when the jury did not, it asks this Court to rule that the instruction should never have been given. This we cannot do, for to do so would allow defendant to put the

- 6 -

trial court in error on its own instruction. We have held that where a party fails to make an objection to an instruction, it is bound by it. Seder v. Peter Kiewit Sons' Co., 156 Mont. 322, 479 P.2d 448; Nelson v. C & C Plywood Corp., 154 Mont. 414, 465 P. 2d 314, 39 ALR3rd 893; 5 C.J.S. Appeal & Error § 1514; 5 Am Jur 2d, Appeal & Error § 618.

Having been so instructed, it became a jury question as to whether or not the notice was adequate timewise. The Fourth Circuit Court of Appeals in Gober v. Revlon Inc., 317 F.2d 47, construing a California statute similar to our statute on notice, ruled that a six months delay in giving notice was not unreasonable as a matter of law. See also: Maecherlein v. Sealy Mattress Co., 145 C.A.2d 275, 302 P.2d 331.

Montana's statute, section 87A-2-607, R.C.M. 1947, provides in pertinent part:

"Where a tender [of goods] has been accepted

"(a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy".

This being a jury question and the jury having found proper notice was given when Waddell found he had only a 7% calf crop in the spring of 1969, we find no error.

Defendant relies on Whittington v. Eli Lilly and Company, (D.C. W.Va. 1971) 333 F.Supp. 98, to support its position that there is no express or implied warranty in this case. Whittington is not comparable on the facts. There, a woman purchased birth control pills which were claimed to be / "virtually 100% protection". They were not 100% effective, and she brought the action on a breach of warranty theory against the drug manufacturer. The uncontradicted proof showed a pregnancy rate of women taking the pill never exceeded 1.9 pregnancies per 100 women on the pill. The court held this percentage provided "virtually 100% protection". Too, in Whittington, the action was brought by a remote purchaser apparently on a common law basis. Here, the action is brought

under the Uniform Commercial Code, sections 87A-2-313, 314,315, R.C.M. 1947, by a purchaser directly from the seller.

In the instant case, warranties made to Waddell were not met, nor were those implied warranties of merchantability and fitness met. Prior to using artificial insemination Waddell got a 95% calf crop via natural service. In 1967, he got a 70% calf crop with artificial insemination; in 1968 he got a 7% calf crop using semen from the same bull, under almost identical conditions. The only logical inference is that something was wrong with the semen purchased in 1968 from ABS by Waddell.

Defendant's second issue concerns the trial court's refusal to allow the testimony of Louie Petrie and J.M. Brooks. We find no error in the court's ruling. The testimony did not bear directly on the specific issues presented.

Mr. Brooks, a rancher living at Cohagen, Montana runs a cow-calf operation of between 300 and 400 head. He had used the artificial insemination program for some five years, and kept rather complete records of his breeding program. Defendant sought to introduce his testimony to show the management techniques used in his artificial insemination program, the importance of the inseminator, and the importance of keeping records. Defendant argues that such testimony goes directly to the issue because of the fact that Waddell kept no records, contrary to instructions given at the school; and that this was a primary cause or factor in Waddell's calf crop failure. Too, Waddell had testified that he knew at least 75% of his cattle by sight and defendant desired to get from Brooks' testimony whether that 75% identification was common. Also, Brooks had used semen from Skylandmere in 1968 with successful results.

The court ruled that Brooks could testify if defendant could establish that Brooks used Skylandmere's semen labeled 804K, could identify it, and got calves. Apparently this could not be established; defendant withdrew Brooks as a witness.

The testimony of Petrie, a rancher who also used Skylandmere's semen in 1968, was offered for the same reasons that Brooks' testimony was offered and was not allowed, in that such testimony did not relate to the facts of this case. We find no error.

Defendant's third issue conerns whether or not defendant received a fair trial. This issue reargues issue No. 2 and further argues that the court erred in allowing Kelly Waddell to testify as to why he got over a 70% calf crop, while his father got only 7%. Kelly was asked:

> "Mr. Waddell, do you know of anything that could account for the difference between the percentage of calf crop you received from cattle, and the percentage of calf crop your father received, other than faulty semen?"

Objection was made that the question called for a conclusion of the witness and invaded the province of the jury. The objection was overruled, the court stating:

> "You'll have an opportunity in cross-examination to explore his reasons."

Kelly then testified:

> "I don't see no reason to. The semen was just bad."

Defendant argues that this dealt with one of the main issues and was prejudicial. We find this not so. Defendant fully cross-examined Kelly, noted for the jury's consideration that he was not a licensed inseminator; that even though he had attended the school he did not have a manual (he used his father's) and that he had only read part of the manual. All of this was before the jury, plus the fact that Kelly was supervised, at least for several head, during the insemination process by ABS representative Bill Stewart. We find no error.

The final issue concerns the trial court's giving certain instructions and its failure to give several of defendant's offered instructions. Defendant argues the court's failure to give several of defendant's instructions prevented the jury from being fully and properly instructed on the law applicable to the case.

We have carefully studied the instructions given and those refused and find no error. Several of defendant's instructions were refused as being repetitious and properly so. The court properly instructed the jury on implied warranty and express warranty. Reading all of the court's instructions together we find the jury was properly instructed on the law applicable to the case.

Defendant takes exception to the court's instruction on damages. Court's Instruction No. 20 reads:

> "Every person who suffers detriment from the unlawful act or omission of another person may recover from him a compensation therefor in money which is called damages. In this case detriment is the loss or harm suffered. The measure of damages is the amount which will compensate for all the detriment proximately caused thereby hereinbefore defined, whether it could have been anticipated or not."

This is an approved MJIG instruction on damages and we find no error.

Judgment of the trial court is affirmed.

_John Conway Harrison_
Associate Justice

We Concur:

_James T. Harrison_
Chief Justice

_Gene B. Daly_

_Frank R. Haswell_
Associate Justices

_Peter G. Meloy_
Hon. Peter G. Meloy, District Judge, sitting for Justice Wesley Castles.