**ATLAS CHEMICAL INDUSTRIES, INC.,**
Appellant,

v.

**M. P. ANDERSON, Appellee.**

No. 8019.

Court of Civil Appeals of Texas,
Texarkana.

June 18, 1974.

Rehearing Denied June 25, 1974.

R. H. Brin, Jr., Strasburger, Price, Kelton, Martin & Unis, Dallas, Gerald K. Burns, Atlas Chemical Industries, Inc., Wilmington, Del., Joe Bailey Allen, Bean, Ford, Schleier, Allen & Gardner, Kilgore, for appellant.

Earl Sharp, Longview, Paul W. Anderson, Marshall, L. F. Burke, Longview, for appellee.

RAY, Justice.

The original opinion handed down by this court on January 15, 1974 is withdrawn and the following is substituted therefor.

This is a water pollution case.* Appellee (plaintiff) M. P. Anderson instituted suit June 17, 1968, against appellant (defendant) Atlas Chemical Industries, Inc., (Atlas), seeking to recover damages alleged to have been caused by the depositing of industrial waste upon 60 acres of Anderson's land. The case was tried before a jury and judgment entered upon the verdict for Anderson in the sum of $61,375.00. Motion for new trial was overruled and the appeal has been timely perfected to this court. Appellant presents 26 points of error.

In 1922, appellant Atlas constructed an activated carbon processing plant at Mar-

---

* Originally assigned to Associate Justice Matt Davis, but reassigned upon his untimely death.

shall, Harrison County, Texas. This plant has been in continuous operation since its establishment and converts lignite into activated carbon by a process using acids and large quantities of water to wash the lignite. Since 1922, the washwater containing lignite, carbon and other waste elements has been continuously discharged into a surface water drainage ditch known as Darco Ditch or Darco Creek. Because of the lignite, carbon and other constituents, the washwater has an inky, black color and tends to leave a black deposit when the solids settle out. Until 1964, when acid neutralization facilities were installed at the plant, the washwater had an acid content.

In August, 1964, Paul W. Anderson made a gift to his son, appellee M. P. Anderson, of a 185-acre tract of land located along Darco Creek. Three streams come together at about the center of the 185-acre tract. Potter's Creek flows through lands of Paul Anderson and onto and across the M. P. Anderson property from the northwest to the south. The Darco Creek enters the tract from the northeast. After Darco Creek enters the property, a small stream known as Coldwater Creek joins the Darco Creek and flows on until they join with Potter's Creek on appellee's property. The combined creeks, known as Potter's Creek, then flow south to the Sabine River. Because of the washwater volume, both Potter's Creek and Coldwater Creek assume the nature of Darco Ditch.

Over the years since the establishment of the Atlas plant, the creek waters on appellee's land have been black and a black sediment has been built up in the creek bottom and creek waters and regularly deposited on vast areas of land (60 acres of appellee's land) adjacent to the creek as the result of frequent flooding. Due to the Atlas effluent, the creek waters have been rendered useless and grass and vegetation in the area of the stream have been destroyed.

Paul Anderson had made numerous claims against Atlas during the time that he owned the land and had been paid for temporary damages on more than one occasion and had executed compromise and settlement agreements relative to his individual claims, as distinguished from the claim now made by his son, M. P. Anderson.

Since 1961, the quality of the Atlas washwater has been under the jurisdiction of the Texas Water Quality Board (formerly the Texas Water Pollution Control Board). Various permits allowed Atlas to discharge waste water into Darco Creek in accordance with the directions of the Board. By the summer of 1970, Atlas accomplished the elimination of suspended solids from the washwater. However, there is evidence that Atlas violated its permits from their inception through the year 1969.

Most water pollution cases have arisen out of an unintentional escape of liquid substances which have migrated from one area to another, causing damage to the areas that the pollutants have touched. In those cases it has been necessary for the plaintiff to obtain a favorable finding from the trier of facts on the issue of negligence, as well as proximate cause, in order to be successful in the litigation. Guest v. American Petrofina Company, 485 S.W.2d 926 (Tex.Civ.App. Texarkana, 1972, no writ); 13 Baylor Law Review 199, The Trial of a Water Pollution Case, by Allison & Mann. In Turner v. Big Lake Oil Company, 128 Tex. 155, 96 S.W.2d 221 (1936), the plaintiff sought to impose strict liability on the defendant in a pollution case in the face of a jury finding of no negligence. The jury found that salt water escaped through broken levees or dams from defendant's salt ponds and lakes and onto plaintiff's lands, but there was no subsidiary finding that this constituted negligence. The court held that, absent a finding of negligence, liability of the de-

fendants was not fixed. Thus, Turner v. Big Lake Oil Company established the principle that Texas does not follow the English rule of strict liability in cases of unintentional torts involving pollution.

In the instant case, appellee contends that the discharge of pollutants by Atlas was intentional and, therefore, the rule in Turner v. Big Lake Oil Company is not applicable. Appellant Atlas concedes that the discharge of its industrial effluent was intentional, but claims that it was not done wantonly or maliciously with intent to injure the appellee. It contends that it operated its business in a prudent manner and in accordance with the Texas Water Quality Act, Art. 7621d–1, (which Act has now been superseded by the Texas Water Code, Acts 1971, 62nd Leg. p. 110, Ch. 58, repealing Art. 7621d–1).

■ The court disagrees with appellant that malicious or wanton conduct must accompany intentional discharge in order for there to be liability. The common law rules applicable to a water pollution case in which the effluent has been intentionally, as opposed to unintentionally, discharged into a stream of water are declared by this court to be as hereinafter set forth:

## LIABILITY

■ I. In common law actions for damages resulting from the intentional discharge of pollutants, the doctrine of strict liability, as in the classic law of nuisance and trespass, shall apply. In order to prove a prima facie case in such pollution litigation, the plaintiff will be required to prove by a preponderance of the evidence the following:

A. That plaintiff has property rights and/or privileges in respect to the use or enjoyment of the water, air, land, chattels, or other property or interests invaded or interferred with by defendant; and,

B. That the defendant has committed an act or acts of commission or omission which,

(1) Endangers or destroys the life or health of a living thing or being, or;

(2) Gives offense to persons of ordinary sensibilities, or;

(3) Obstructs reasonable and comfortable use of property, or;

(4) Is a substantial invasion of the public or private use and enjoyment of property, or;

(5) Creates an unreasonable risk of danger to a person, land or chattels, or;

(6) Constitutes the alteration of the physical, thermal, chemical or biological quality of, or the contamination of, any water in this state that renders the water harmful, detrimental, or injurious to humans, animal life, vegetation, or property, or to public health, safety, or welfare, or impairs the usefulness or enjoyment of the water for any lawful or reasonable purpose; and

C. That the conduct of the defendant or his act or acts of omission or commission are or were the legal or producing cause of the invasion, injuries or damages; and

D. That the invasion, or the commission of the act or acts, or the omission of an act or acts is or was intentional. The intentional act, omission or invasion may be one in which the defendant perpetrates the invasion or interference; or where the defendant knows that pollution is resulting or is substantially certain to result from his conduct; and

E. The amount of plaintiff's damages.

■ The apportionment of damages against joint tort-feasors shall be governed by the holding in Landers v. East Texas Salt Water Disposal Co., 151 Tex. 251, 248

S.W.2d 731 (1952). There the Court held that a salt water disposal company and an oil company charged with dumping salt water in plaintiff's ponds were to be held jointly liable, absent proof by one or both defendants of the lesser damage caused by its or their individual acts.

With the above principles in mind, we undertake the review of appellant's points of error concerning liability.

■ Appellant's first and second points of error complain of the trial court's ruling allowing appellee a trial amendment alleging negligence for the first time after the close of the evidence, and the failure of the court to reopen the case to allow appellant to introduce evidence related to appellee's charge of negligence. From what we have said, appellee's allegations of negligence are not applicable, since we have construed this case as being one of strict liability. Appellee's allegations of negligence are disregarded and the appellant's first and second points of error are overruled.

Appellant's third point of error is that, "The trial court erred in allowing any recovery in the face of the prior releases given by plaintiff's predecessor in title, which constitute a legal bar to such recovery."

We have examined the releases (defendant's Exhibits 6 and 8) and the circumstances and conditions surrounding those releases and have determined that the releases do not apply to future damages. Two thousand five hundred dollars was paid for each release. Appellant's (defendant's) Exhibit No. 8 dated January 3, 1962, is a release that covered only those injuries "to the date of this release." It is obvious that it did not cover future injuries. Appellant's (defendant's) Exhibit No. 6 was executed approximately two years later on December 17, 1963, and included, among other things, a release for past damages to appellant's land and water supply, the death of a colt and an injury to a mare. The release covers all past damages suffered by Paul W. Anderson as a result of the discharge of acids and solids into Darco Creek. However, the release did not purport to cover matters of future damages. We therefore conclude that the trial court did not err in granting recovery "in the face of the prior releases."

■ We further hold that the evidence was insufficient to raise a fact issue to be submitted to the jury concerning the defenses of the past releases and the settlements by Paul W. Anderson. The two releases do not purport to cover future damages, but only cover the damages accruing to the date of the releases. Appellant's third and fourth points of error are overruled.

■ In considering appellant's tenth through fourteenth points of error, it is our desire to eliminate the confusion that has been established by those pollution cases making a distinction between private nuisance, public nuisance, negligent nuisance, nuisance without negligence, intentional nuisance, absolute nuisance, and all the trespasses. In Rylands v. Fletcher, L. R. 3 H.L. 330 (1868) the English court in applying the doctrine of strict liability made no distinction between the unintentional escape of dangerous substances and those cases in which the defendant precipitated the escape. In the *Rylands* case, if the substance escaped and caused harm, the defendant (the one who had confined the substance originally) was liable, irrespective of his actions in the escape. See Prosser, Law of Torts, 3d Ed., § 77. We do not go that far. We have applied strict liability only to those pollution cases in which the defendant has set the substance in motion for escape, such as the discharge of the harmful effluent or the emission of a harmful gas or substance. Here, it is undisputed that appellant Atlas intentionally discharged its effluent into the stream that ultimately crossed appellee Anderson's land. Under the doctrine of strict liability, it matters not whether Atlas intended to injure Anderson's property when it put the

pollutants into the stream, except perhaps whether or not Anderson would be entitled to exemplary damages. By intentionally discharging its effluent into the stream, it became liable for all of the foreseeable damages resulting from the harm caused by the effluent. In other words, one who intentionally discharges potentially hazardous effluent into a stream does so at his peril and is liable for the foreseeable injuries and damages that may result therefrom. The question thus becomes one of whether the conduct of the actor was intentional or unintentional and is not a question of whether the resulting damages were intended or unintended.

■ If the escape of the harmful substance was unintentional, then the test to be applied in determining whether the defendant is liable is one of negligence rather than strict liability.

■ In view of our determination to apply the doctrine of strict liability to the facts of the instant case, the finding of the jury in answer to Special Issue No. 1 that the appellant discharged waste into the stream and that such was a producing cause of the damage to the Anderson land satisfies the doctrine of strict liability. In determining actual damages, it matters not whether the discharged quantities were excessive, if whatever quantities that were discharged in fact caused injury. Since it is undisputed that appellant intentionally discharged effluent into the stream which subsequently caused injuries to appellee's land, it makes no difference that the jury may have found intentional misconduct and negligent misconduct on the basis of the same acts, because the trial court, under the doctrine of strict liability as outlined by this court, could disregard the findings of the jury and enter its judgment upon the undisputed facts, that is, that Atlas intentionally discharged its harmful effluent into the stream that crossed Anderson's land. Appellant's tenth through fourteenth points of error are overruled, and appellant's fifteenth point of error concerning the negligence issues becomes immaterial. See Nelson v. C & C Plywood Corp., 154 Mont. 414, 465 P.2d 314, 39 A.L.R.3d 893 (1970), which applies the nuisance concepts and Restatement of the Law, Torts, Sec. 882, in determining liability from intentional discharges of harmful effluents. See Burr v. Adam Eidemiller, Inc., 386 Pa. 416, 126 A.2d 403 (1956), and Bana v. Pittsburgh Plate Glass Co., 48 Ohio Land Abst. 594, 76 N.E.2d 625 (Ct.App. Ohio 1947) applying trespass law in determining liability for intentional dsicharges of pollutants. Also see 26 S.W.L.J. 1, 14 (1972), Torts by Page Keeton.

We recognize that the rule of law hereinabove set out by this court may be a departure from the rules heretofore established by our courts and may be in conflict with some of those decisions. However, we believe that the common law rules of tort liability in pollution cases arising out of the intentional discharge of pollutants should be in conformity with the public policy of this state as declared by the Legislature in the Texas Water Code, (1971) Sec. 5.090, Polluting and Littering; Sec. 21.002, Policy (concerning water quality); Sec. 21.003 Definitions, (9), (10), and (11), Industrial Waste, Other Waste, and Pollution, respectively; and Secs. 21.551 et seq., making it a criminal offense to pollute water in violation of a permit or other order issued by the Texas Water Quality Board, the Texas Water Development Board, or the Texas Railroad Commission. Basically, the public policy is that the quality of water in this State shall be maintained free of pollution. See 48 Tex.Law Rev. 1029, 1169 (1970) Water Pollution Control, Part V, Judicial Protection of Water Resources: Private Action, The Public Trust Doctrine, and Administrative Review, by Duncan E. Osborne; and Parker v. San Jacinto Co. Water Control and Imp. Dist. No. 1, 154 Tex. 15, 273 S.W.2d 586 (1955). Texas Water Code, Sec. 21.003(11) states that " 'Pollution' means the alteration of the physical, thermal, chemical, or biological quality of, or the contamination of, any

water in the state that renders the water harmful, detrimental, or injurious to humans, animal life, vegetation, or property, or to public health, safety, or welfare, or impairs the usefulness or the public enjoyment of the water for any lawful or reasonable purpose."

As early as 1955 our Supreme Court stated in *Parker*, supra

"* * * The protection of the purity of the waters of this State is a public right and duty under the Conservation Amendment. Arts. 698b[1] and 1362[2], Vernon's Penal Code and Art. 4444[3], R. C.S., plainly declare the pollution of public waters to be against the public policy of the State and provide appropriate sanctions to implement this policy."

We further believe the public policy of this State to be that however laudable an industry may be, its owners or managers are still subject to the rule that its industry or its property cannot be so used as to inflict injury to the property of its neighbors. To allow industry to inflict injury to the property of its neighbors without just compensation amounts to inverse condemnation which is not permitted under our law. We know of no acceptable rule of jurisprudence which permits those engaged in important and desirable enterprises to injure with impunity those who are engaged in enterprises of lesser economic significance. The costs of injuries resulting from pollution must be internalized by industry as a cost of production and borne by consumers or shareholders, or both, and not by the injured individual.

During the industrial revolution in this country, the law shifted to accommodate economic growth and those who invested therein and was changed to the detriment of isolated individuals who have collectively come to bear the cost of such growth.

In recent years, however, the U.S. Congress and the State Legislatures have recognized that we literally cannot live with the pollution caused by industrial waste and have passed various statutes, rules and regulations controlling the disposal and emission of pollutants. It is as if we have allowed a monster (pollution) to be created which will either devour or destroy us all. As Austin attorney (and former Executive Director of the Texas Water Rights Commission) Frank R. Booth stated in his speech before the mineral section of the Texas Bar Association in San Antonio on July 2, 1970, "Pollution is waste. We can't get rid of waste by moving it from here to there. We already are at the stage where 'there' is getting so full that it's backing up to 'here.'" No longer can we permit industrial development and pollution at the expense of individuals. · The social utility of allowing uncontrolled pollution without compensation for the injury caused thereby is no longer tolerable. Neither the benefit of pollution causing activity to the community nor the comparative investments of plaintiff and defendant will be factors considered in determining whether there is a compensable injury. Citizens who are injured should be allowed to maintain an action for an interference which is unreasonable and offensive to persons of ordinary sensibilities. During this century the course of the law has been to incorporate economic growth and the protection of important business activities into the law as a value which quickly became the paramount value in the resolution of conflicting interests in pollution litigation. "But in this age of environmental concern it is clear that this value warrants no greater emphasis than others. Thus, it is time for the reassessment of the law to the end of redressing its imbalance, a time for reflection on where responses to legitimate needs in another time carried the law." 34 Am. Trial Lawyer's Journal 202, 223–224, Pollu-

---

1. Acts 1931, 42nd Leg. 1st C.S. p. 88, Ch. 42, now Sec. 21.001, Texas Water Code.

2. Acts 1917, 35th Leg. Ch. 88, p. 288, now Sec. 5.090, Texas Water Code.

3. Acts 1923, 38th Leg. Ch. 85, p. 177, now Sec. 21.001 et seq., Texas Water Code.

tion as a Nuisance: Problems, Prospects and Proposals, by David A. Rice, Professor of Law, Boston University.

## LIMITATIONS

 The statutory period of limitation in Texas for bringing an action for damages resulting from an injury to property is two years. Art. 5526, Vernon's Ann.Tex.Rev.Civ.Stats. We hereby declare the rule as it applies to cases of intentional pollution to be that each act of pollution is a new and separate offense and injury, and that when the pollution is continuous, each day's act of pollution constitutes a new, separate and independent offense or injury. See Northwestern Fertilizing Co. v. Village of Hyde Park, 97 U.S. 659, 24 L.Ed. 1036 (1878). Art. 5526, Tex.Rev.Civ.Stats. only bars recovery for acts of pollution occurring more than two years immediately preceding the institution of suit for recovery of damages for injuries caused by the pollution. The old distinction between permanent injury and transient or temporary injury is abolished and shall not control in determining the running of the two-year statute of limitations. The fallacy of the old rule is that if a private industrial polluter injures a property owner's lands, however slightly, for a period of more than two years without the property owner bringing suit, the industry can destroy the property owner's lands with impunity as well as immunity. This impenetrable shield operates if the defendant-polluter can persuade the court that its activities have "permanently" harmed the plaintiff-landowner. Thus, the judicial shield which has allowed polluting industries to contaminate the lands of neighboring property owners with impunity, if such pollution can be traced back more than two years, during which time no lawsuit has been filed against the industrial polluter, is here withdrawn. A plaintiff may now bring successive causes of action to remedy a continuing invasion of his property right. Indeed, some cases may require successive suits. Suit may now be brought, at the election of the plaintiff, for what has traditionally heretofore been (1) transient or temporary damages, (2) permanent damages, or (3) both, limited only by the plaintiff's ability to plead and prove the damages sought and the effect of the statute of limitations.[1] Thus, the plaintiff may elect to bring successive causes of action every two years if the damages are continuing and if he can prove additional injuries and damages. However, he may elect to bring one suit for past, present and future damages, limited only by his ability to plead and prove the damages sought and the effect of the statute of limitations. Since the defense of limitations is an affirmative defense, the burden of going forward with the evidence shifts to the defendant to limit the recovery of the plaintiff by showing the extent of the injury that occurred more than two years before suit was filed. On past damages, the trial court may submit the issue to the jury on the basis of the damages occurring during the two years immediately preceding the filing of suit and instruct them that they are to disregard all injuries which have been proven to their satisfaction to have occurred more than two years previously, in arriving at the amount of money to which the plaintiff would be entitled to compensate him for his injuries. The two-year statute of limitations shall begin to run from the date that the injury was actually discovered, or when the injury should have been discovered by an ordinary person using reasonable diligence.

Appellant's fifth point of error states that appellee's recovery was barred by the two-year statute of limitations. We hold that in a case of continuing pollution, each day's act of pollution is a new, separate and independent offense or injury and

---

1. See Kornoff v. Kingsburg Cotton Oil Co., 45 Cal.2d 265, 288 P.2d 507 (1955); Restatement, Torts, Sec. 930, Comment C; Mc-Cormick on Damages, Sec. 127, p. 511 et seq.; Prosser, Law of Torts (4th Edition 1971) Sec. 13 at p. 75 n. 36.

thus, appellee was entitled to compensation for his injuries occurring for the two years immediately preceding the bringing of his lawsuit. (See Sec. 31.553 Texas Water Code, which states, "Each day that a violation occurs constitutes a separate offense.") Upon appellee's showing that he had been injured as a result of the pollution, the burden of going forward with the evidence shifted to Atlas to demonstrate the amount and kind of damage that was more than two years old and not subject to recovery. This, appellant did not do. Appellant's fifth point of error is overruled.

Appellant has grouped its sixth, seventh, eighth and ninth points of error concerning the evidence relative to acts of fraud or misrepresentation as would prevent the running of the statute of limitations. Our disposition of this case does not require us to decide these points. However, from our review of the record, we have concluded there was sufficient evidence to sustain the jury's findings that agents or representatives of appellant had represented to appellee and his father that the pollution was temporary and would be remedied within a reasonable period of time. The ultimate issue, however, was whether or not the promises or assurances of Atlas to correct the pollution problem were offered as consideration by Atlas in exchange for appellee Anderson's promise to postpone the filing of suit and thus, prevent the running of the statute of limitations. This issue was not submitted nor did appellee request it. Pelton v. Trico Oil Co., 167 S.W.2d 625 (Tex.Civ.App. Dallas 1942, no writ); Haddad v. Bagwell, 317 S.W.2d 781 (Tex. Civ.App. El Paso 1958, writ ref'd, n. r. e.); Panhandle Construction Co. v. Hood, 114 S.W.2d 632 (Tex.Civ.App. Austin 1938, error ref'd). We decline to consider whether or not the jury's findings in answer to Special Issues 17 through 19 give rise to such fraud or misrepresentation as would prevent the running of the statute of limitations. Appellant's points of error, 6, 7, 8 and 9 are not reached.

## DAMAGES

 Actual damages, not barred by limitation, may be recovered in pollution cases consistent with the following rules:

1. If the damage is to real property, then the measure of damage shall be the difference between the fair market value of the real property before and after the injury, unless the defendant can convince the trier of facts that the cost of restoration or repair is less than the difference in the fair market value before and after the injury.

2. The same measure of damages shall apply to injuries inflicted upon personal property.

3. Injuries to human beings shall be governed by the law of damages established as applicable to personal injuries in Texas.

4. Damages to living things shall be the diminution in their fair market value at the time of their damage, or, the cost of replacement if the living thing is killed or destroyed. If the living thing injured or destroyed is not one which would ordinarily have a fair market value, then the measure of damages would be the cost of removal, replacement, or monetary damages for harm done.

 Plaintiff may elect to maintain an action at law for damages for his past injuries and at the same time seek equitable relief through an injunction or other extraordinary remedy to abate the continuance of the injury.

Both damages for personal injuries and injuries to property may be recovered by the plaintiff, if he has suffered them as a result of an intentional act or omission committed by the defendant.

 The fact that the defendant has been granted a license or permit to discharge pollutants into a stream or the fact that the most modern control devices avail-

able have been installed in defendant's plant will not defeat an action for damages sought by the plaintiff. The defendant may introduce evidence of his permit and his compliance with the permit and the fact that he is using the most modern control devices available in an attempt to mitigate his damages. Muncie Pulp Co. v. Martin, 23 Ind.App. 558, 55 N.E. 796 (1899); 39 A.L.R.3d 910, 922–923.

In assessing damages for diminution in value of real property, the burden is upon the plaintiff to show that his entire tract of land has been adversely affected by the pollution; otherwise, he may be limited to a finding of diminution in value of the limited acreage injured.

■ Exemplary or punitive damages may be recovered in a pollution case if the plaintiff pleads and proves that the conduct of the defendant was:

1. Unlawful; or

2. Malicious, or wanton, or oppressive, or fraudulent, or in wanton disregard for the rights or safety of others; or

3. That the act or conduct was done directly with intent to injure. The intent to injure need not be directed specifically toward the plaintiff. The polluter becomes liable if he intentionally violates his license or permit, or if he fails to use available pollution control devices to prevent harm to the downstream riparian owners or rightful users of the stream. The matter of exemplary damages is ordinarily one of fact to be resolved by a jury or the trier of facts.

The correct measure of actual damages in this case was the diminution in the fair market value of the land, which diminution the jury found to be $175.00 per acre for sixty acres, or a total difference in fair market value before and after damage of $10,500.00. The loss of use and the loss of the fair rental value are items to be included in the fair market value test and are not separate items of damage when the

measure being applied is the diminution in fair market value of the land. If the measure of damages being applied is the restoration of the land, then loss of rental value or loss of use may be a separate item of damage, along with and in addition to the cost of restoration.

■ The correct measure of damages to the land in this case was the diminution in fair market value, because the cost of restoration ($45,000.00) was well in excess of the diminution in fair market value. Ordinarily, the diminution in fair market value is a measure to be applied when cost of restoration exceeds the diminution in fair market value. 25 C.J.S. Damages § 84. See Superior Const. Co. v. Elmo, 204 Md. 1, 102 A.2d 739 (1954); Bana v. Pittsburgh Plate Glass Co., supra; Pacific Express Co. v. Lasker Real-Estate Ass'n, 81 Tex. 81, 16 S.W. 792 (1891). We believe the jury was justified in arriving at a diminution in the fair market value of appellee's land of $175.00 per acre, that sixty acres were damaged and that the jury's verdict was supported by the evidence.

■ Appellant's 21st through 26th points of error concerned the amount of the damages awarded in the judgment of the trial court. The trial court did err in its computation of the damages to be awarded to appellee. However, the amount of damages awarded can be reformed. The trial court should have entered a judgment in favor of appellee Anderson for actual damages in the sum of $10,500.00.

■ Appellant's ninth point of error is that the trial court erred in allowing damages for loss of use of the 185-acre tract from August 27, 1964, to July 1, 1966, for the reason that the same was barred by limitations. As already pointed out, loss of use is an item included in the fair market value test and not a separate item of damage when the measure being applied is the diminution in the fair market value of the land. Appellant's ninth point of error is

sustained. The same reasoning applies to appellant's sixteenth point of error which is that, "The trial court erred in awarding damage for loss of use from August 27, 1964, to July 1, 1966, for the reason that there are no negligence or nuisance issues and findings creating any cause of action for such period." Appellant's sixteenth point of error is sustained for the same reason. We do not reach the question of whether or not the damage for loss of use would be barred by the 2-year statute of limitations, since it is not necessary for us to decide that issue in view of what we have said concerning the proper measure of damages to be applied in this case.

Appellant's seventeenth, eighteenth and nineteenth points of error concern the jury's finding that the damage to the land was temporary. Although the evidence was sufficient to sustain that finding, we do not deem it necessary to reach these three points in view of our abolition of the distinction between temporary and permanent damage to land and our application of the doctrine of strict liability.

Appellant's twentieth point of error is that, "The trial court erred in allowing exemplary damages in the absence of adequate pleadings, evidence and findings to support the same."

There is evidence in the record that appellant recognized it had a pollution problem as early as 1958 and that it reported to the Texas Water Quality Board in 1960 that designs were being drawn to alleviate the waste disposal problem. However, from 1960 to 1968, no additional facilities for waste treatment had been installed at appellant's plant. In 1963, the Texas Water Pollution Control Board issued a statutory permit authorizing appellant to discharge waste of a certain quality and quantity into the stream that crossed the Anderson property. There is further evidence that appellant violated its permit from its inception through the year 1969. The jury found that appellant had discharged excessive quantities of lignite and

carbon waste into Darco and Potter's Creeks after July 1, 1966, and that such was a producing cause of the damage to appellee's land. The jury further found that appellant willfully polluted the stream, "willfully" being defined as the "intentional and purposeful disregard of the known rights of another." Exemplary damages were assessed at $25,000.00. There can be no question but that appellant intended to violate its permit, which made its acts both wrongful and unlawful, and such acts were malicious and in wanton disregard for the rights or safety of others as a matter of law, especially where it was brought to the attention of appellant by both appellee and the state agency that Atlas was violating its permit.

It is no defense to exemplary damages that appellant did not intend to specifically harm appellee. When one discharges a dangerous or injurious substance into a stream, it can be readily foreseen that it will likely cause harm to those adjoining or using the stream. The more the dangerous substance is introduced into the stream, the greater the probability of injury. One who repeatedly and daily discharges excessive pollutants into the stream is bound to have known that he would cause injury. Here, where appellant was told that it was injuring appellee and it continued its excessive discharge of pollutants into the stream, there can be no question but that appellant acted maliciously.

It is certain that if one throws a live hand grenade into a crowd, and it explodes, it is bound to hurt some members of the crowd. No one would argue for a moment that the act was not malicious, and neither could it be successfully argued that, if the plaintiff were one of those hurt, the defendant did not intend to specifically hurt the plaintiff. We think there was evidence to support the jury verdict and that the court was justified in granting appellee exemplary damages in the sum of $25,000.-00. Appellant's twentieth point of error is overruled.

The trial court should have entered a judgment in favor of appellee Anderson for actual damages in the sum of $10,500.-00 and $25,000.00 exemplary damages, for a total of $35,500.00. The judgment of the trial court is here reformed to reflect the corrected amount.

Appellee's cross-point contending that he was entitled to the full sum of $45,000.00 as damages for the cost of restoration in addition to the other damages found by the jury is hereby overruled.

The judgment of the trial court is reformed, and as reformed, is affirmed.

CHADICK, C. J., and CORNELIUS, J., concur in the result.