**Charlotte Ann Kaechele MIETH; Bonnie Reznicek, Agent and Attorney–in–Fact for Royce Marie Kaechele; Bonnie Jean Kaechele Reznicek; Bonnie Jean Kaechele Reznicek, Successor Trustee of the Charles Kaechele Trust for Royce M. Kaechele and Successor Trustee of the Clara Kaechele Trust for Royce M. Kaechele, Appellants,**

v.

**RANCHQUEST, INC.; Texical Energy Corporation d/b/a Texical, Inc.; Amcas, Inc.; Robert Huckaby; Pensor Production Company; Robert Leon; and Tex–Atic Resources, Inc., Appellees.**

No. 01–02–00461–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 17, 2005.

K. Ray Campbell, Michael D. Jones, Kilburn, Jones, Gill & Campbell, L.L.P., Houston, for appellants.

Michael D. Conner, Hirsch & Westheimer, P.C., Houston, for appellees.

Panel consists of Chief Justice RADACK and Justices NUCHIA and HANKS.

## OPINION ON FURTHER REHEARING

SAM NUCHIA, Justice.

We grant appellee's motion for further rehearing, withdraw our opinion issued May 20, 2004, and issue this opinion in its place.

In October 1997, appellants sued appellees to recover damages caused to their surface estate by appellees' operations at and re-entry of an abandoned oil and gas well. The case was tried to a jury in 2001, and the jury found that Texical Energy Corporation d/b/a Texical, Inc. (Texical) was 100% liable for negligence proximately causing injury to appellants' property. The jury awarded $200,000 as reasonable costs to repair appellants' property, $10,000 in exemplary damages, and $88,000 in attorney's fees, but found no diminution in the value of appellants' property. The trial court concluded that the injury to the property was permanent and, therefore, that the correct measure of damages was the diminution in value to the land. Because the jury found no diminution in value, the trial court rendered judgment for appellees. We affirm.

## I. Background

### A. The Lease Operation

Appellants own the surface of a 973–acre tract of grazing land in Austin County, Texas. Appellants referred to this tract, purchased in 1952 by Charles Kaechele, appellants' deceased father, as the "Best" tract. In 1992, appellants and the owners of the mineral estate executed an oil and gas lease to appellee Ranchquest, Inc. (Ranchquest). Sometime before March 16, 1996, drilling operations were begun on the well known as Best No. 2 well, which was located on the northern 300+ acres of the 973–acre tract.

Robert Leon and Robert Huckaby, the individual appellees, owned or controlled a group of corporations, including appellees Ranchquest, Texical, Tex–Atic Resources, Inc. (Tex–Atic), and Amcas, Inc. (Amcas). Ranchquest acquired oil and gas leases, and Texical operated the oil and gas wells on those leases. At the time of trial, Leon and Huckaby used Tex–Atic to operate oil and gas wells on the leases acquired by Ranchquest. Leon and Huckaby used Amcas as the repository for investors' funds to be used in drilling, completing, equipping, and operating oil and gas wells drilled on behalf of Texical or Tex–Atic on leases acquired by Ranchquest. Appellee Pensor Production Company (Pensor) is a drilling contractor.

In July 1996, Pensor entered into a contract with American Cascade Energy, Inc., Texical's predecessor, to provide the rig and crew that would take over the drilling on the Best No. 2 well. In August 1997, Pensor's contract was amended to add the Best No. 3 well. Appellees continued operations on the Best No. 2 well through the remainder of 1996 and into 1997. Appellees did not construct reserve pits or a ring levee around the Best No. 2 well surface location until after March 1997. As a result, the drilling operations discharged drilling fluids, diesel fuel, oil, and saltwater onto appellants' pasture and raw sewage into open pits. Although appellees decided to construct a reserve pit for the Best No. 2 well in 1997, they never closed it. The Best No. 2 well produced for a few days in December 1997 and January 1998, but was no longer producing at the time of trial.

In August 1998, appellees began working on the Best No. 3 well, also located on the northern 300+ acres of the tract. Although a reserve pit and a ring levee were constructed for the Best No. 3 well, appellees pumped fluids out of the pit and into a ditch that had been dug to run fluids into a nearby creek.

### B. Texas Railroad Commission Reports

During trial, the trial court admitted the Railroad Commission (the Commission) reports on the Best Nos. 2 and 3 wells into evidence. The Commission inspected the operations and conditions maintained on

the Best No. 2 well location 24 times, and cited the Best No. 2 well on almost every inspection for violating Railroad Commission Statewide Rule 8 (Rule 8).[1] On March 3, 1999, the Commission issued a report containing findings of fact regarding alleged violations committed at the Best No. 2 well. The report notes that the Commission conducted inspections from December 18, 1996 through August 28, 1998. The Commission found that the operator had caused or allowed the discharge of 20 to 30 gallons of lubricating oil from machinery.[2] The Commission also found overflowing mud tanks combined with rain wash-off from the rig affecting an area approximately 100 by 150 feet on the west side of the rig. In addition, other oil discharges from around the diesel motors had flowed from a 70–by–8–foot pit into an adjacent pasture. The Commission noted that, by January 23, 1997, the affected area had increased in size to approximately 300 by 500 feet and that the inspectors had observed an oil and diesel sheen.[3] The report noted that the operator was also using the reserve pit for disposal of raw sewage from a trailer house and that recent rainwater had caused the pit to overflow.

The Commission's report on the Best No. 3 well showed that, in August 1998, appellees began work on this well. Before commencing drilling operations, appellees constructed a reserve pit and a ring levee at the Best No. 3 well location. However, appellees pumped fluids out of the reserve pit and into a ditch that had been dug to run the fluids into the East Little San Bernard Creek. The Commission made 22 inspection visits to the Best No. 3 well location and found numerous violations of Rule 8. Unlike the Commission's factual findings on the Best No. 2 well, the Commission's findings of fact on the Best No. 3 well were not included in the record. As of the time of trial, the reserve pit on the Best No. 3 well location was still open.

## C. Testimony

### 1. Frank Roberts, Jr.

At trial, Frank Roberts, Jr., a consultant for appellees, testified that the site around the Best No. 3 well was cleaned up during the summer of 1999 and was left in as good a shape as it could have been after a drilling completion. The reserve pits on the Best Nos. 2 and 3 well sites were still in existence and were then open because appellants had threatened the contractor and told him not to close the sites. The black, cracked, thick substance shown in photographs taken by appellants in February 1999 was simply a mixture of graphite and glycerin used in conjunction with mud to get the pipe to slide free. This mixture, which was regularly used in these types of drilling operations, was non-toxic and could easily be disposed of. Pensor took over the drilling operations on the Best No. 2 well in July 1996, but did not construct a ring levee and reserve pit until early 1997. The drilling operations ended sometime in early June 1997.

Roberts, who was working with Texical on the Best No. 3 well at the time, arrived at the site shortly after the Commission had inspected the Best No. 3 well. The

---

1. Railroad Commission Statewide Rule 8 provides rules and regulations to protect fresh water from pollution by salt water. 16 TEX. ADMIN. CODE § 3.8 (2004) (Tex. R.R. Comm'n, Water Protection).

2. Although the Texas Railroad Commission listed American Cascade Energy as the operator during the entire period during which the violations occurred, Texical took over the Best No. 2 well on July 6, 1996 and operated it until June 1997.

3. The report noted that the operator initiated clean-up work on February 3, 1997.

inspection revealed that the reserve pit had overflowed and had reached the road drainage, discharging into the creek at a rate of one gallon per minute. The inspector noted that drilling fluid had overflowed the reserve pit embankment, affecting an area of approximately 20 by 30 feet. Because there was no sewage septic tank, all sewage was discharged into earthen pits. Roberts agreed to remediate the soil contaminated by the drilling fluid, which he did a few days later.

Roberts further testified about the following inspections:

- January 26, 1999: there were no additional violations, but the drilling-fluid residue coating the bottom of the ditch still remained and needed to be cleaned.
- February 3, 1999: the drainage ditch going into the creek had not been cleaned up and was backing up with water.
- February 29, 1999: Roberts agreed to have the drilling fluids in the ditch cleaned up.
- March 3, 1999: about five gallons of oil were on the ground where the drilling rig motors had been.
- June 21, 1999: the north pit contained chloride levels of 450 parts per million (ppm) and a film of oil covered 20% of the pit; the south pit contained a chloride level of 35,800 ppm and no oil.
- August 3, 1999: both pits remained open, both had a skim of oil on them, and the south pit contained saltwater chlorides of 35,000 ppm.
- Subsequent inspections revealed that heavy rains had resulted in more saltwater inside the pits. Roberts said that, when a pit is dewatered, it leaves behind some chlorides and that the chloride content is likely to rise when mixed with rainwater.

### 2. Michael Swetish

Appellants' expert, environmental scientist Michael Swetish, testified that, in his opinion, both sites were heavily impacted by salt. Many of the pits remained open; the pits had high salt levels in them; the salt extended beyond the pit boundaries; and oil and hydrocarbons remained in the pits. In his opinion, the sites were in need of remediation because the contaminants that remained on the sites were elevated to levels that would impact the landowners' property if not corrected. Should the contaminated soil not be decontaminated, the contaminants would, over time, seep into the soil deeply enough to contaminate the underground water sources.

Swetish testified that, if a pit contained high levels of contamination, the contaminated material could be removed and taken to a treatment facility and the pit could be backfilled with clean material. Swetish collected soil samples and conducted three soil surveys, at depths of from 3 to 18 feet, which revealed high levels of chlorides in the drill material, ranging from 108,000 to 57,000 ppm on the Best No. 2 well and from 48,000 to 47,000 ppm on the Best No. 3 well. Swetish concluded that the sites were contaminated with salt levels sufficient to restrict vegetative growth and to disperse salt into the surrounding environment, not only by spreading laterally, but, with time, by moving more deeply into the ground, potentially impacting deeper zones of soil and ground water. Swetish estimated that the remediation, which would include excavating, transporting, and disposing of the contaminated material and replacing that material with clean fill, would cost $288,000. On cross-examination, Swetish testified that the remediation plan that he suggested covered a total of four acres and that he had not conducted any ground-water studies to support his

conclusion that the existing conditions, if left unrepaired, would result in groundwater contamination.

### 3. Frank Reznicek

Frank Reznicek, the husband of appellant Bonnie Reznicek, had worked on the Kaechele ranch since 1980. At the time of trial, he was the ranch manager responsible for planning and overseeing the day-to-day activities at the ranch. He testified that the defendants had polluted the property with diesel oil and salt water and that the chlorides about which the appellants were complaining were present on the property at all times and did not come and go with the rain. He also testified that the contamination had been basically the same since 1996.

### 4. Robert Moorman

Robert Moorman, a real estate appraiser and appellees' expert witness, testified that he was able to form an opinion of the current fair market value of the Best tract after inspecting the property and researching comparable sales. In his opinion, the market value of the Best tract was $750 per acre, a total of $730,000. He testified that, if the four acres were contaminated, the maximum diminution in value of appellant's property would be $3,000.

### 5. William Haley

William Haley, appellants' real estate appraisal expert, testified that he used the sales-comparison approach in determining the fair market value of appellants' property. He testified that this approach compares the property being appraised to similar properties that have been sold in the area, taking into account any particular features that could raise or lower the value of the property. He concluded that the fair market value of appellants' property was $730,000 before the contamination and $430,000 after the contamination. His basis for the $300,000 diminution in value

was the cost to remediate, plus management costs or administrative costs typically incurred by the owner in decontaminating the property.

## II. Analysis

### A. Temporary or Permanent Injury

■ In their first issue, appellants contend that the trial court erred in determining that the damage to their property was permanent, rather than temporary.

■ Permanent damage results from activity that is of such a character and that exists under such circumstances "that it will be presumed to continue indefinitely." *Bayouth v. Lion Oil Co.*, 671 S.W.2d 867, 868 (Tex.1984). Permanent injuries are those that are "constant and continuous, not intermittent or recurrent." *Atlas Chem. Indus., Inc. v. Anderson*, 524 S.W.2d 681, 685 (Tex.1975), *overruled on other grounds, Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922 (Tex.1981). When the turf or sod is so injured as to make the land less productive in the future, the injury is permanent, even though it may not be perpetual. *See Ft. Worth & N.O.R. Co. v. Wallace*, 74 Tex. 581, 12 S.W. 227, 228 (1889). The proper measure of damages for permanent injury to the land is the diminution in the value of the land. *Kraft v. Langford*, 565 S.W.2d 223, 227 (Tex. 1978).

■ Temporary injuries are intermittent, sporadic, or recurrent injuries to land that are contingent upon some irregular force, such as rain. *Bayouth*, 671 S.W.2d at 868. When an injury to land is temporary and can be remediated at reasonable expense, the proper measure of damages is the cost of restoration to its condition immediately preceding the injury. *Kraft*, 565 S.W.2d at 227. However, the diminution in fair market value is the measure of damages when the cost of restoration ex-

ceeds the diminution in fair market value. *North Ridge Corp. v. Walraven*, 957 S.W.2d 116, 119 (Tex.App.-Eastland 1997, pet. denied) (citing *Atlas Chem. Indus., Inc. v. Anderson*, 514 S.W.2d 309 (Tex.Civ. App.-Texarkana 1974), *aff'd*, 524 S.W.2d 681 (Tex.1975)).

In this case, the evidence showed that the ground was so injured as to impair the productivity of the soil and that the injury had been constant since 1996. Therefore, the trial court did not err in determining that the damage to the tract of land was permanent.

We overrule appellants' first issue.

### B.  Comment on the Weight of the Evidence

■■ In their second issue, appellants contend that the trial court erred in commenting on the weight of the evidence. A comment on the weight of the evidence is a comment by the trial court, usually in the jury charge, that suggests the trial court's opinion concerning an issue in the case. *Maddox v. Denka Chem. Corp.*, 930 S.W.2d 668, 671 (Tex.App.-Houston [1st Dist.] 1996, no writ); *see also* Tex.R. Civ. P. 277 ("The court shall not in its charge comment directly on the weight of the evidence or advise the jury of the effect of their answers...."). Appellants' complaint involves statements made by the trial court in discussions with the attorneys out of the presence of the jury. We decline to review such statements as comments on the weight of the evidence.

■ Under this same issue, appellants refer to "a 'judicial misconduct' complaint." They specifically complain about the trial court's statement, "[I]f [the injury] is temporary, how much it costs to remediate, which under some situations the court could take the position that $288,000 is excessive; therefore, I bypass that measure and go to diminished value." Appel-

lants claim that the trial court "intended from the beginning to award minimal damages irrespective of what the evidence demonstrated."

We first note that appellants have not preserved any error regarding comments the trial court made. Moreover, we interpret the trial court's statement to be a recognition that the measure of damages to land, when the cost of remediation exceeds the diminution in fair market value, is the diminution in fair market value. *See North Ridge Corp.*, 957 S.W.2d at 119.

We overrule appellants' second issue.

### C.  Unsolicited Offer to Purchase

■ In their third issue, appellants contend that the trial court erred in allowing the introduction of Amcas's unsolicited and unaccepted offer to purchase the Best tract as evidence of market value of their property because that offer constituted an inadmissible offer of settlement. Appellants claim that the appellees used the unaccepted offer to purchase to argue that there was no diminution in value to the Best tract.

Amcas offered, in writing, to purchase appellants' property for $730,000, which was, according to Swetish, the estimated fair market value of the property before the injury. The offer, which the trial court admitted into evidence, stated, "This letter is not an offer of settlement and is not intended in that manner." Appellants did not accept the offer.

Texas Rule of Evidence 408 states, "Evidence of (1) furnishing or offering or promising to furnish or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidi-

ty of the claim or its amount." Tex.R. Evid. 408.

Amcas's offer to purchase the property stated specifically that it was not a settlement offer and did not ask appellants to compromise their claim in any way. *See Tatum v. Progressive Polymers, Inc.*, 881 S.W.2d 835, 837 (Tex.App.-Tyler 1994, no writ).

We hold that the unaccepted offer to purchase was not a settlement offer. Accordingly, we overrule appellants' third issue.

### D. Negligence Per Se

■ In their fourth issue, appellants contend that the trial court erred in refusing to submit their requested instruction on negligence per se because the evidence established Texical's repeated violations of Rule 8.

■ Negligence per se is a concept in which a legislatively imposed standard of conduct is adopted by the civil courts as defining the conduct of a reasonable and prudent person. *Carter v. William Sommerville & Son, Inc.*, 584 S.W.2d 274, 278 (Tex.1979). In such a case, the jury is not asked to decide whether the defendant acted as a reasonable, prudent person would have acted under the same or similar circumstances. *Id.* The statute itself states what a reasonable, prudent person would have done. *Id.* If an excuse is not raised, the only inquiry for the jury is whether the defendant violated the statute or regulation and, if so, whether the violation was a proximate cause of the accident. *Id.*

■ For an administrative rule or regulation to be a standard for negligence, a purpose of the rule must be to afford protection to the class of persons to which the injured party belongs from the hazard involved in the particular case. *Cont'l Oil Co. v. Simpson*, 604 S.W.2d 530, 534 (Tex. Civ.App.-Amarillo 1980, writ ref'd n.r.e.); *see also Carter*, 584 S.W.2d at 278. Section 91.101 of the Texas Natural Resources Code specifically provides that the Commission "shall adopt and enforce rules and orders ... to prevent pollution of surface water or subsurface water in the state." Tex. Nat. Res.Code Ann. § 91.101 (Vernon Supp.2004–2005). Rule 8, subsection (b) states that "[n]o person conducting activities subject to regulation by the commission may cause or allow pollution of surface or subsurface water in the state." 16 Tex. Admin. Code § 3.8 (2004) (Tex. R.R. Comm'n, Water Protection).

■ Rule 8 clearly affords protection to the class of persons to which appellants belong, *i.e.*, surface owners, against the hazard involved, *i.e.*, pollution of surface and subsurface water. Therefore, negligence per se applies to the facts of this case. Accordingly, the trial court abused its discretion by refusing to submit an instruction on negligence per se. However, because the jury found Texical negligent under the common-law definition, the trial court's error was harmless.

We overrule appellant's fourth issue.

### E. Legal Sufficiency

■ In their fifth issue, appellants challenge the legal sufficiency of the evidence to support the jury findings in questions five, seven, and eight.[4] Appellants

---

4. Under their fifth issue, appellants recite the standard of review for a *factual* sufficiency challenge. However, in their brief, appellants argue *legal* sufficiency and do not argue that the evidence was factually insufficient to support the jury's findings in questions five, seven, and eight. In their response to appellees' further motion for rehearing, appellants use both "no evidence" and "against the great weight and preponderance of the evidence"

argue that the trial court erred in denying their motion to disregard these jury findings because the jury's answers to these three questions were not supported by the evidence.

### 1. Question 5—Ranchquest

Jury question five asked, "Do you find that Ranchquest, Inc. failed to comply with paragraphs 14 and 15 of the lease?" The jury answered, "No."

■■■ Appellants claim that the jury's refusal to find that Ranchquest failed to comply with paragraphs 14 and 15 of the lease was not supported by the evidence.[5] Appellants contend that "Texical and Amcas were responsible for Ranchquest's performance of the Best Lease and became responsible for compliance with the Best Lease." They also argue that "Texical was the successor operator and was responsible for compliance with the oil and gas lease as Ranchquest's assignee and designated operator." The lease states, "Lessee and/or *his successors in interest,* shall compensate the Grantee...." (Emphasis added.) The jury could have reasonably concluded that only Texical, as Ranchquest's successor operator, was negligent and, thus, responsible for the damage caused to appellants' property.

We overrule that part of appellants' fifth issue complaining about the jury's response to question five.

### 2. Question 7—Damages

language without distinguishing between the application of that language to legal or factual sufficiency. We decline to consider appellants' response as raising a factual sufficiency complaint because appellants could have raised that argument on original submission, but did not. *See, e.g., McGuire v. Fed. Deposit Ins. Corp.,* 561 S.W.2d 213, 216 (Tex.Civ.App.-Houston [1st Dist.] 1977, no writ) (op. on reh'g).

Appellants contend that there is no evidence to support the jury's answers to question seven. Question seven and the jury's answers were as follows:

What sum of money, if any, now paid in cash, would fairly and reasonably compensate Plaintiffs for their damages, if any?

Do not include any amount for any condition existing before the occurrence in question, except to the extent, if any, that such other condition was aggravated by any injuries that resulted from the occurrence in question.

Do not include in your answer any amount that you find Plaintiffs could have avoided by the exercise of reasonable care.

Consider the following elements of damages, if any, and none other:

1) the reasonable and necessary cost to remediate the surface of Plaintiff's land.

Answer: $200,000

2) the diminution, if any, in the fair market value of the Plaintiff's land.

Answer: $0

■■■ Because part one of question seven is the measure of damages for a temporary injury to property, it is immaterial to this appeal. We therefore consider only the jury's finding in part two of question seven. Inasmuch as appellants had the burden of proving the diminution in fair market value to their land, we construe

5. Paragraph 14 of the lease provided that the lessee "and/or his successors in interest" would compensate the grantee for any damage to crops or fences. Paragraph 15 of the lease provided that the lessee would pay for damage to crops or improvements caused by any oil and gas operations and, upon the abandonment of any well, would fill excavations and pits, leaving the ground in as near the same condition as it was before the drilling.

their issue to assert that they established the diminution in value as a matter of law. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989).

■ In reviewing a challenge by the party with the burden of proof to an adverse jury finding, we must first examine the record for evidence supporting the finding, ignoring all evidence to the contrary. *Id.* If there is no evidence to support the finding, we must examine the entire record to see if the appellant has established the contrary proposition as a matter of law. *Id.; see also Ritchey v. Crawford*, 734 S.W.2d 85, 86 (Tex.App.-Houston [1st Dist.] 1987, no writ) (stating that appellate court must determine whether evidence as matter of law requires conclusion contrary to verdict).

Two witnesses testified regarding the property's diminution in value: Haley, a real estate appraiser who testified for the appellants, and Moorman, a real estate appraiser who testified for appellees. Haley testified that the fair market value of appellants' property was $730,000 before the contamination and $430,000 after the contamination.

Moorman testified that he had been told that real estate with a pocket of contamination could be sold by cutting the contaminated area from the sale and that the diminution in fair market value would be the number of acres times the value per acre. In this case, the number of contaminated acres was four, and Moorman valued the property at $750 per acre. Moorman testified that, although the contaminated area was a small percentage of the entire tract, he would not go so far as to say that there was no diminution in market value.

He calculated that the maximum diminution in value of appellants' property would be $3,000.

■ Appellees suggest that, because there had been previous oil and gas operations on the property, the jury could have reasonably determined that any diminution in value was due to those earlier operations. However, they do not direct us to any evidence of contamination that existed before drilling on the Best wells was begun. Appellees also contend that their offer to buy the property for $730,000 was proof that there was no diminution in value. In Texas, unaccepted offers to purchase property are no evidence of market value of property. *Hanks v. Gulf, Colo. & Santa Fe Ry. Co.*, 159 Tex. 311, 320 S.W.2d 333, 336–37 (1959); *Lee v. Lee*, 47 S.W.3d 767, 785 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).

Our examination of the record does not reveal any evidence to support the jury's finding of $0 diminution in the fair market value of the land. Therefore, we must determine whether appellants established the amount of diminution as a matter of law.

■ Appellants contend that they established $300,000 diminution in value as a matter of law, arguing that Moorman's testimony of a maximum of $3,000 diminution was not contained in a written report and was "off the cuff." Because appellants did not object to Moorman's testimony during trial, they have waived any objection to it on appeal.[6] *See* TEX.R.APP. P. 33.1.

The evidence regarding the amount of diminution in value was conflicting. Given

---

6. Appellants also argue that the jury was confused on the diminution of value issue because the cost of remediation and diminution in value were contained in the same issue, making the diminution in value appear to be a request for additional damages. Appellants did not object to the submission of question seven, although appellees expressed some concern during the charge conference that question seven might confuse the jury.

this conflict, appellants have not established, as a matter of law, the diminution in fair market value of their land.

We overrule that part of appellants' fifth issue complaining about the jury's response to part two of question seven.

### 3. Question 8—Attorneys' Fees

Appellants contend that the jury's answers to question eight is not supported by the evidence. In question eight, the jury found that $88,000 was a reasonable and necessary fee for the services of appellants' attorneys at the trial level, but made no award for appellate fees. We need not address this issue because appellants requested attorneys' fees for their breach-of-contract claim. The jury did not find that appellees breached their contract with appellants, and the trial court did not award attorneys' fees.

### III. Conclusion

We affirm the judgment.